UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>JOSIAH LARKIN,<br><br>　　　　Defendant. | Case No. 15-cr-00010-SI-1<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL**<br><br>Re: Dkt. No. 286 |

Defendant Josiah Larkin moves for a judgment of acquittal on one charge of conspiring to file false claims. Dkt. No. 286. Argument on the matter was heard on December 16, 2016. Having considered the arguments of the parties and the papers submitted, the Court hereby DENIES defendant's motion.

**BACKGROUND**

Defendant was charged with one count of conspiracy to file false claims against the United States, in violation of 18 U.S.C. § 286, and thirty-one counts of making false, fictitious, or fraudulent claims against the United States, in violation of 18 U.S.C. § 287, based on his filing of federal income tax returns that falsely claimed education expenses under the American Opportunity Tax Credit (AOTC).[1] Dkt. No. 1. As alleged in the indictment,

> The AOTC is a refundable federal income tax credit that reduces the amount of federal tax owed and can result in a refund if the credit exceeds the amount of taxes owed. The AOTC is available for post-secondary education expenses such as tuition, fees, and course

---

[1] Five of the thirty-one counts brought under 18 U.S.C. § 287 ultimately went to the jury for a verdict. *See* Dkt. No. 261.

>materials paid by the student, their spouse, or one claiming the student as a dependent on their tax return.

*Id.* ¶ 1.

Count One of the indictment charged that defendant Larkin and his four co-defendant employees at his tax preparation firm, from November 2012 through August 2013, "agreed, combined, and conspired to defraud the United States by obtaining, and aiding others to obtain, the payment and allowance of false, fictitious, and fraudulent claims." *Id.* ¶ 8. The indictment further charged that, "[a]s part of the scheme, the defendants filed with the IRS, or assisted in filing, federal income tax returns falsely claiming that education expenses ranging from $3,816 to $4,000 had been paid and the taxpayers were therefore eligible for the AOTC and a corresponding tax refund." *Id.* ¶ 9.

Larkin's four co-defendants all pled guilty before trial. Dkt. Nos. 81, 139, 174, 200. Two of these co-defendants, Ursula Choice and Krishell Robinson, testified at trial, pursuant to their plea agreements.

On September 15, 2016, a jury found defendant guilty of one count of conspiracy to file false claims (Count One) and five counts of making false, fictitious, or fraudulent claims against the United States. Dkt. No. 261. Defendant now moves for a judgment of acquittal of Count One under Federal Rule of Criminal Procedure 29. Dkt. No. 286.

**LEGAL STANDARD**

Rule 29 of the Federal Rules of Criminal Procedure requires the Court, on a defendant's motion, to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). A defendant may move for a judgment of acquittal after a guilty verdict, without being required to have made such a motion prior to the case's submission to the jury. Fed. R. Crim. P. 29(c).

The Court's review of the constitutional sufficiency of evidence to support a criminal conviction is governed by *Jackson v. Virginia*, 443 U.S. 307 (1979), which requires a court to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt." *Id.* at 319; *see also McDaniel v. Brown*, 558 U.S. 120, 133 (2010). This rule establishes a two-step inquiry:

> First, a . . . court must consider the evidence presented at trial in the light most favorable to the prosecution. . . . [And s]econd, after viewing the evidence in the light most favorable to the prosecution, the . . . court must determine whether this evidence, so viewed, is adequate to allow "any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt."

*United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc) (quoting *Jackson*, 443 U.S. at 319) (final alteration in *Nevils*).

**DISCUSSION**

Defendant Larkin argues that the Court should grant a judgment of acquittal on Count One because the government failed to offer evidence at trial sufficient to prove that he was guilty beyond a reasonable doubt of conspiring to defraud the United States. By his motion, defendant challenges his conspiracy conviction as lacking sufficient evidence of the first element of conspiracy, asserting that the evidence presented to the jury failed to prove that any agreement to defraud was reached between him and his alleged co-conspirators.

In order to convict Larkin of conspiracy to file false claims against the United States, the jury had to find: "(1) an agreement to engage in criminal activity, (2) one or more overt acts taken to implement the agreement, and (3) the requisite intent to commit the substantive crime." *See United States v. Green*, 592 F.3d 1057, 1067 (9th Cir. 2010) (quoting *United States v. Montgomery*, 384 F.3d 1050, 1062 (9th Cir. 2004)). In a conspiracy charge, "[t]he agreement need not be explicit; it is sufficient if the conspirators knew or had reason to know of the scope of the conspiracy and that their own benefits depended on the success of the venture." *Id*. "The agreement may be inferred from circumstantial evidence." *Id.* (citing *United States v. Hubbard*, 96 F.3d 1223, 1226 (9th Cir. 1996)). "[I]nferences of the existence of such an agreement may be drawn 'if there be concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose.'" *Hubbard*, 96 F.3d at 1226 (quoting *United States v. Melchor-Lopez*, 627 F.2d 886, 890 (9th Cir. 1980)). Mere association with

3

members of a conspiracy or knowledge of the conspiracy, "without an intention and agreement to accomplish a specific illegal objective, is not sufficient to make one a conspirator." *Id.* (quoting *Melchor-Lopez*, 627 F.2d at 891).

The Ninth Circuit has described how the government proves an overarching conspiracy, stating:

> A single conspiracy can only be demonstrated by proof that an overall agreement existed among the conspirators. Furthermore, the evidence must show that each defendant knew, or had reason to know, that his benefits were probably dependent upon the success of the entire operation. Typically, the inference of an overall agreement is drawn from proof of a single objective . . . or from proof that the key participants and the method of operation remained constant throughout the conspiracy. The inference that a defendant had reason to believe that his benefits were dependent upon the success of the entire venture may be drawn from proof that the coconspirators knew of each other's participation or actually benefitted from the activities of his coconspirators.

*United States v. Fernandez*, 388 F.3d 1199, 1226 (9th Cir. 2004) (quoting *United States v. Duran*, 189 F.3d 1071, 1078 (9th Cir. 1999)).

Defendant argues that his conviction on Count One cannot stand because "the government here had to prove that any agreement Mr. Larkin reached with another person was an agreement to defraud" and "it was not sufficient to prove an agreement to perform an act that facilitated Mr. Larkin's alleged scheme." Dkt. No. 286 at 5. Defendant argues his alleged co-conspirators, Krishell Robinson and Ursula Choice, at no point testified that they agreed or understood that they were playing a role with Larkin to defraud the government. *Id*. at 6-8. Defendant argues that the evidence is therefore insufficient to establish a conspiracy and that the only evidence in the record of an agreement to defraud was Robinson and Choice's guilty pleas, which the Court instructed were inadmissible as substantive proof of conspiracy. *Id*. at 7-8. Defendant does not attack the existence of fraudulent behavior. Instead, he argues that there is no evidence that he, Robinson, and Choice had an *agreement* to act fraudulently.

In support, Larkin cites two out-of-Circuit cases. In *United States v. Parker*, the president of a securities brokerage was charged with conspiring with his sales staff to sell fraudulent bonds. 839 F.2d 1473 (11th Cir. 1988). At a manager's meeting, the president falsely told his sales staff

4

1    that the company had short-term investments backed by $10 to $12 million worth of government
2    bonds. *Id*. at 1476.  He instructed them to sell the products and trained them on how to do so. *Id*.
3    at 1476-77.  The Eleventh Circuit upheld the president's conviction for mail fraud but reversed the
4    conspiracy conviction, finding that the sales staff's mere presence at the manager's meeting,
5    without any indication that they were aware of the president's fraudulent scheme, was insufficient
6    to prove an express or implied agreement. *Id*. at 1478.  Testimony showed "that nothing was said
7    at the meeting that would give rise to suspicion." *Id.*  Therefore, there was not sufficient evidence
8    to "establish a common agreement to violate the law." *Id.*

9    Larkin also cites to *United States v. Hanson*, in which the defendant was convicted of
10   conspiracy based on an alleged scheme in which she and her employee solicited fraudulent
11   investments.  41 F.3d 580 (10th Cir. 1994).  The employee promised to find investors who would
12   invest directly in the defendant's company.  That employee then made false representations to the
13   investors in order to procure them.  *Id*. at 581.  The Tenth Circuit held that the government's
14   circumstantial evidence – proof of the employee's employment by the defendant, that the
15   defendant wished to expand her company, and that the employee "was successful in attracting
16   investors to what ultimately turned out to be a poor investment" – was insufficient to establish
17   beyond a reasonable doubt an agreement to defraud investors.  *Id*. at 582.

18   The Court finds these cases distinguishable from the facts at hand.  In both *Parker* and in
19   *Hanson*, there was no evidence of any type of coordination between the defendant and the alleged
20   co-conspirator.  The salespeople in *Parker*, for instance, had no knowledge that the defendant had
21   lied to them about having $10 to $12 million worth of bonds to back the investments they were
22   selling.  Indeed, the Eighth Circuit later refused to apply *Parker* at a defendant's behest,
23   explaining, "we read the case to mean that *in the absence of suspicious circumstances* that would
24   alert the average person of potential wrongdoing, a salesperson has not acted fraudulently."
25   *United States v. Behr*, 33 F.3d 1033, 1036 (8th Cir. 1994) (citing *Parker*, 839 F.2d at 1479 n.4).

26   The government, by contrast, cites to two Ninth Circuit cases that are more on point.  In
27   *Green*, the appellate court affirmed a defendant's conviction of conspiracy to commit mail and
28   wire fraud, which required the jury to find "an agreement to engage in criminal activity . . . ."

*Green*, 592 F.3d at 1067. Richard Favara was the owner of a technology company and founder of a nonprofit organization who worked with defendant Judy Green to bid on projects for the "E-Rate" program, a federal subsidy program for public schools. *Green*, 592 F.3d at 1067. Favara testified that he worked with the defendant to secure fifteen E-Rate projects for his technology company. *Id*. Favara also made the defendant Director of Grants for his nonprofit, allowing Green to award bogus grants to schools to strengthen their applications for E-Rate funding. *Id*. Favara testified that he allowed defendant Green to post a falsified financial overview of his nonprofit on its website "to make the company look stronger when she was talking to schools." *Id*. The Ninth Circuit ultimately found the evidence showed "that both Green and Favara were committed to the common goal of obtaining the fifteen E-Rate contracts, and that both agreed to utilize false financial information to achieve that goal. This is sufficient evidence for the jury to find an agreement existed." *Id*. at 1067-68 (citing *Montgomery*, 384 F.3d at 1062-63).

Similarly, in *Hubbard*, defendants were convicted of conspiracy to commit mail fraud stemming from a scheme of odometer tampering. *Hubbard,* 96 F.3d at 1225. Defendant Michael Hubbard rolled back the odometers on certain used vehicles he had purchased. His employee, James Lyon, then sold the cars to a company that converted them into taxicabs. *Id*. at 1226. Even in the absence of evidence directly showing that Lyon knew the mileage numbers were fake, the Ninth Circuit found sufficient evidence to support Hubbard's conspiracy conviction. Lyon told customers that the mileage figures were accurate, handled paperwork for the purchase and sale of the used cars, and inputted data about the vehicle mileage into an inventory that he personally maintained. *Id*. at 1227. The appellate court also noted that Hubbard and Lyon had to coordinate the rolled-back mileage figures to be consistent on vehicle price lists and other documents. *Id*. In sum, the Ninth Circuit found that "[t]his scheme required their interaction and cooperation. Thus, a rational jury could have found a 'concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose,' which is sufficient to establish evidence of an agreement." *Id*. (citing *Melchor-Lopez*, 627 F.2d at 890).

In this case, Robinson testified extensively regarding her training and work under defendant Larkin. She testified that on a client's tax return she inputted $3,901 on the line for

qualified education expenses, explaining that during training Mr. Larkin told her "that the 4,000-dollar figure will get them the stimulus money. So we had to put either $4,000 or something close to that in order for them to get the money back." Tr. 389:10-24. Robinson further testified that no one else besides defendant instructed her to do this, that she did not tell the clients this, and that defendant did not tell her to tell the clients this. Tr. 390:2-8. Robinson stated that, from the time she first began preparing returns under defendant, she understood "that if I put the 4,000-dollar figure, that they'll have a refund for a thousand dollars." Tr. 399:5-15. When asked whether she went over the tax returns with the clients, Robinson testified, "Most of the time I didn't . . . ." Tr. 394:18-21.

Robinson also testified that, at defendant's direction, she prepared "[a] lot" of tax returns that had no income and "$4,000 or close to $4,000 in education expenses claiming the AOTC . . . ." Tr. 392:4-17. On this point, Robinson testified as follows:

> Q. Did you know whether the clients that you prepared tax returns for for the 2012 season, whether they had $4,000 in education expenses?
>
> A. I'm not sure, no.
>
> Q. Okay. Did you have any knowledge that that figure was false for any of the taxpayers?
>
> A. Knowledge, no, but I had a feeling.
>
> Q. Tell us about that.
>
> A. Well, a lot of them didn't have jobs, so I don't know how they would have been able to pay $4,000 of expenses without income.

Tr. 402:1-11.

Finally, Robinson testified:

> Q. And why did you plead guilty?
>
> A. Initially going in, I didn't know what I was doing was wrong; but I knew the end of the season what I was doing was wrong, and I continued to do it.
>
> Q. Okay. And at what point did you know it was wrong? What led you to believe it was wrong?
>
> A. Just things -- just things didn't add up. I just started thinking more and more about it, clients started complaining more and more about

7

> not getting their refund, and I just put two and two together and realized that it wasn't all the way right.

Tr. 404:4-14.

Choice similarly testified to filing tax returns that reported education expenses that had not been verified with the client. She testified that she did not ask a client about expenses when determining the amount of money the client had for the education credit. Tr. 557:22-24, 560:2-9. She testified that when she was doing her first tax return, she asked Robinson, who was office manager at that time, what number should be put into that box and "was told to put a number close to 4,000." Tr. 558:2-7. She also stated that she later asked defendant the same thing and that he confirmed what Robinson had already told her. Tr. 558:8-15, 560:2-6.

Choice testified that at some point during the tax season defendant gave her a school affidavit for clients to sign saying they were in school. Tr. 566:25-567:6. The affidavit did not list expenses and Choice was not told to ask for expenses. Tr. 567:7-10. Defendant also instructed her to call clients and ask them if they were enrolled in school. If they were, the clients were to come to the office with a copy of their student ID or class schedule. Tr. 562:8-18. If the client was not a student, Choice was told "to give them the option to go to any City College campus and apply for classes." Tr. 563:1-4. Choice had a list of free, noncredit classes for this purpose. Tr. 563:5-15; *see also* Tr. 397:14-398:4 (Robinson testifying to same).

Here, Robinson and Choice's participation in the charged scheme is far more like that of the employee in *Hubbard*, where the Ninth Circuit upheld a conspiracy conviction, than it is of the employees in *Parker*, where the Eleventh Circuit vacated such a conviction. As with the odometer-tampering scheme in *Hubbard*, defendant Larkin and his employees Robinson and Choice had to coordinate; the "scheme required their interaction and cooperation." *See Hubbard*, 96 F.3d at 1227. Like Hubbard's employee, Robinson and Choice were responsible for inputting false data into the company's systems, interfacing with clients, and representing to clients that falsified numbers were the correct numbers. *See id.* And unlike in *Parker*, here "[t]here is ample evidence of suspicious circumstances . . . to put a reasonable person on notice of potential fraud." *See Behr*, 33 F.3d at 1036 (citing *Parker*, 839 F.2d at 1479 n.4). Robinson and Choice each testified that defendant instructed them to input a figure for education expenses onto clients' tax

8

1    returns, without verifying those numbers with the client.  They also had a list of free classes to
2    provide clients with no education expenses, and testified that Larkin told them to tell clients to go
3    enroll in classes if they had no education expenses.  Robinson had a "feeling" that something was
4    wrong, because many of her clients didn't have jobs, so Robinson didn't "know how they would
5    have been able to pay $4,000 of expenses without income."  Tr. 402:5-11.  Even crediting
6    defendant's argument that his employees were ignorant of the scheme, Robinson testified that she
7    continued to participate in the scheme even once she realized that something was wrong.  Tr.
8    404:4-14.

9        The government presented sufficient proof at trial that "the conspirators knew or had
10   reason to know of the scope of the conspiracy and that their own benefits depended on the success
11   of the venture."  *See Green*, 592 F.3d at 1067.  Much as the co-conspirator in *Green* allowed
12   Green to post a falsified financial statement to his website to help Green achieve the larger scheme
13   of obtaining E-Rate contracts, here Robinson and Choice similarly helped to falsify financial
14   information to achieve Larkin's larger conspiratorial objective of defrauding the IRS.  The
15   testimony showed that defendant instructed Robinson and Choice regarding the falsification of
16   education expenses and the provision of a list of free noncredit courses to clients.  The jury
17   therefore could have found that Robinson and Choice knew that the success of this scheme
18   depended on their participation regarding the educational expense figures.  *See Hubbard*, 96 F.3d
19   at 1226.

20       The above-cited testimony was given independently of any admissions contained in
21   Robinson and Choice's plea agreements.  Thus, defendant is incorrect that the plea agreements are
22   the only source of evidence in the record of a conspiracy to defraud.  *See* Dkt. No. 286 at 7.
23   Viewing the evidence in the light most favorable to the government, the evidence shows a scheme
24   that required continued interaction and coordination between Larkin and his tax preparer
25   employees, and that Robinson and Choice "knew or had reason to know of the scope of the
26   conspiracy."  *See Green*, 592 F.3d at 1067.  Based on the evidence presented at trial, a rational
27   trier of fact could have found beyond a reasonable doubt that defendant and his employees had an
28

agreement to engage in criminal activity, thus satisfying the first element for a conspiracy conviction.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby DENIES defendant's motion for judgment of acquittal on Count One.

**IT IS SO ORDERED**.

Dated: December 16, 2016

_____
SUSAN ILLSTON
United States District Judge